Willie MILLS et al., Appellants,

v.

Mrs. Nina VINSON et al., Appellees.

No. 7258.

Court of Civil Appeals of Texas.

Texarkana.

Nov. 15, 1960.

Rehearing Denied Dec. 13, 1960.

---

Fred V. Hughes, Tyler, Edwin T. Lacy, Longview, Waldrop, Shaw & Colley, Gordon R. Wellborn, Rex Houston, James N. Phenix, C. A. Keeling, Henderson, for appellants.

Bath, Turner & Lloyd, Henderson, Smead & Harbour, Hamp Smead, Jr., Longview, for appellees.

PER CURIAM.

Mack Vinson, Jr., and wife, and his mother, Mrs. Nina Vinson, as plaintiffs, sued Mrs. Willie Mills and other defendants numbering over three hundred, in trespass to try title to 131.6 acres of land in the Settoon Survey in Rusk County, Texas, and also plead the 10 and 25 year statutes of limitation.

One hundred and eight defendants were personally served and appeared in person and by counsel. 3 defendants were personally served and were represented by guardian at litem. 23 defendants who were personally served defaulted. 17 defendants who were personally served filed disclaimers. 85 defendants or the heirs, or unknown heirs, of those cited by publication appeared by counsel or in person. 85 defendants, or the heirs, or the unknown heirs, of those cited by publication were represented by an attorney ad litem appointed by the court.

Some of the answering defendants also filed a cross-action for title and possession of the lands and the remainder of the answering defendants answered by a denial or a plea of not guilty, or both.

Plaintiffs-appellees, Mack Vinson and Mrs. Nina Vinson, disclaimed any interest in lands described in certain of the appellants' cross-action which were not included within the description of the lands contained in their first amended original petition.

Longview National Bank, brought into the case by the cross-action of certain named appellants, answered by plea of intervention specially alleging title to one-half non-participating royalty interest in the north 100 acres of the lands described in the cross-action, general denial and plea of not guilty. The bank claimed under a non-participating royalty conveyance executed by the appellees Vinsons in the year 1936.

Trial was to a jury upon special issues. The issues and explanatory instructions given to the jury, and the answers of the jury to the issues submitted were as follows:

"Special Issue No. 1:

"Do you find from a preponderance of the evidence that the plaintiffs or those under whom they claim, either in person or through tenant or tenants, have held peaceable and adverse possession of the land in controversy in this suit, cultivating, using, or enjoying the same for any consecutive period of ten years from January 1, 1902, and prior to the 1st day of May, 1958?

"Answer 'Yes' or 'No'.

"Answer: Yes.

"In connection with the above and foregoing Special Issue No. 1 and Special Issue No. 1 only, you are instructed that if you believe from a preponderance of the evidence that Mack Vinson, Sr., went into possession and occupied the tract of land involved in this controversy as an heir of Malachi Vinson, his possession would be presumed to have been in the right of the common title and not adverse to the other heirs of Malachi Vinson, his co-tenants, unless and until he repudiated the title of his co-tenants to any interest in the tract of land in controversy and after such repudiation held the same adversely to the title of said co-tenants, if you find he did so, and until he, Mack Vinson, Sr., either in person or through Mack Vinson, Jr., acting for him, or until Mrs. Nina Vinson, or Mack Vinson, Jr., after the demise of Mack Vinson, Sr., gave notice of such repudiation and adverse claim, if any, to said co-tenants. Co-tenancy or tenancy in common means where two or more parties own undivided interest in the same tract or tracts of land. It was not necessary

for the said Mack Vinson, Sr., during his life time, and for plaintiffs herein after the demise of Mack Vinson, Sr., to give actual notice of said co-tenants of such repudiation and adverse holding, if any, but such notice may be presumed by the jury to have been brought home to the cotenants if the jury finds from a preponderance of the evidence that the adverse occupancy, if any, and the claim of title, if any, on the part of the said Mack Vinson, Sr., and plaintiffs herein. was open, notorious, exclusive and unequivocal for such a length of time as to be inconsistent with the existence of title in such co-tenants and of such notoriety as to constitute notice to the defendants and those under whom they claim title, the inference of notice being one of fact to be determined by the jury.

"Special Issue No. 2:

"Do you find from a preponderance of the evidence that the plaintiffs or those under whom they claim either in person or through tenant or tenants, have held peaceable and adverse possession of the land in controversy in this suit, cultivating, using, or enjoying the same for any consecutive period of ten years from September 5, 1919, and prior to the 1st day of May, 1958?

"Answer 'Yes' or 'No'.

"Answer: Yes."

The trial court entered judgment in favor of plaintiffs Vinsons for the title and possession of the 131.6 acres of land sued for, (and the bank for its above described royalty interest) except for a 2.4 acre strip awarded to certain appellants on their cross-action. The numerous named appellants have appealed. Appellants' points 1 through 11, incl., are grouped together in appellants' brief and relate to the following contentions: That there was no evidence to support the verdict and the jury's answers to Special Issues Nos. 1 and 2; that the verdict, and the verdict as a whole, and

the jury's answers to special issues Nos. 1 and 2 were against the overwhelming weight of the evidence; that the trial court erred in submitting special issues Nos. 1 and 2 because same were not raised by the evidence; and that the trial court erred in overruling appellants' motions for instructed verdict and for judgment non obstante veredicto.

There are many decisions of our Texas Supreme Court with respect to the consideration of "no evidence", "insufficient evidence" and "against the great weight and preponderance of the evidence" points. An excellent discussion of these matters is contained in an article in the April, 1960 issue of the Texas Law Review (38 Texas L.Rev. 362) by Justice Calvert of the Texas Supreme Court, entitled " 'No Evidence' and 'Insufficient Evidence' Points of Error." With respect to the "No evidence" matters we quote from said article in part as follows:

"2. Quantity and Quality of the Evidence.

" 'No evidence' points must, and may only be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

"(a). There is no need here to elaborate on the first of the situations. A complete absence of evidence, either direct or circumstantial, of a vital fact simply adds up to a 'no evidence' situation and the duty of the appellate court to sustain the point is clear. * * *

"(b) The second situation poses only law questions. The so-called evidence is present, and if it may be given pro-

bative force at all it will sustain a verdict and judgment. If, however, it must be discarded because it is hearsay or because its admission and consideration violates the parol evidence rule, or for some similar reason, there will be no evidence left on which the verdict and judgment may rest.

"(c) The scintilla rule, although having its origin at a much earlier date, was firmed up in Texas in Joske vs. Irvine [91 Tex. 574, 44 S.W. 1059].[12] The rule may be stated in these words: when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment. The scintilla rule cannot apply where there is direct evidence of a vital fact; it applies only when the vital fact must be inferred from other relevant facts and circumstances which are proved.[13] If the inference is not a reasonable one a 'no evidence' point should be sustained.[14] It follows that 'no evidence' points based on the scintilla rule require a careful analysis of the facts proved for the purpose of determining whether the vital fact may be reasonably inferred.

"(Note: Footnote 13 above referred to reads as follows):

"13. A host of cases has been examined and no case has been found in which it was held that direct testimony of the existence of the vital fact did no more than raise a surmise or suspicion of its existence.

"(d) The fourth situation is not a true 'no evidence' situation. It usually arises when a jury finds the non-existence of a vital fact or gives a negative answer to an issue inquiring as to the existence of a vital fact, whether the fact be vital to a plaintiff's claim or to an affirmative defense. * * *

"3. Rules of Decision.

"There are no tests or rules for deciding 'no evidence' points in situations (a) and (b) under 2 above. If there is an absolute absence of evidence of a vital fact or if the court is barred from giving weight to the offered evidence of the fact, an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.

"Decision of 'no evidence' points in situation (c) in quite another matter. Whether there is more than a mere scintilla of evidence supporting a finding of a vital fact is often a very close question, and it is not surprising to find a Court of Civil Appeals and the Supreme Court, or the justices of the Supreme Court, in disagreement in a particular case. It is in this situation that the courts have needed and have tried to evolve a guiding rule of decision. The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. * * *

"It is in deciding 'no evidence' points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding."

The footnotes in said article refer to decided cases which support the statements made by Justice Calvert in his excellent article.

Justice Calvert's article also contains an excellent discussion of "insufficient evidence" and "against the great weight and

preponderance of the evidence points", and in connection with the "against the great weight and preponderance of the evidence points" refers to the authoritative case of In re King's Estate, 150 Tex. 662, 244 S. W.2d 660.

The record in this case shows that the record title to the property in question was in the estate of Malachi Vinson, deceased. Malachi Vinson was a bachelor, never married, had no children, died intestate, and was survived by brothers and sisters and descendants of his deceased brothers and sisters. Appellees and appellants (except the appellee bank who was an assignee from appellees) were heirs of Malachi Vinson, and the trial court in connection with Special Issue No. 1 gave the jury the hereinbefore stated instructions with reference to various elements of the law of adverse possession, repudiation of cotenancy and adverse claim to land by one or more cotenants against other cotenants, and with respect to notice of repudiation and an inference of notice of repudiation by open, notorious, exclusive and unequivocal adverse occupancy and claim, etc., all as more fully set out in the court's charge above referred to.

Appellees by their counterpoints 1, 2 and 3 contend that there was evidence to support the verdict of the jury, that same was sufficient, and that the evidence preponderated in favor of the jury verdict. Appellees' counterpoints 4 and 5 read as follows: 4. "The Court did not err in submitting Special Issue Number One to the jury because the evidence showed that Appellees' occupancy, use, enjoyment, and claim of title were continuous, open, hostile, notorious, exclusive, and inconsistent with the rights of any others for a period of more than fifty years." 5. "The evidence conclusively shows that Appellants had constructive notice of Appellees' adverse use and occupancy of the premises and of their claim to the land. It was, therefore, not necessary to prove actual notice to all of them."

In support of their first five counterpoints appellees in their brief state in part as follows: (Note: We omit herefrom appellees' numerous specific references to the Statement of Facts as these references may be found in appellees' brief).

"One of the Appellees, Mrs. Nina Vinson, was too old and infirm to give her testimony at the trial of this case. Her son, Appellee Mack Vinson, was born on the land in 1898, from which time on Appellees and Mack Vinson, Sr., Appellees' husband and father respectively, had continuous and exclusive possession and use of the land, paying all taxes thereon before they became delinquent. They were never questioned about their title until the Tatum Oil Field came in, before which time Appellee, Mack Vinson, believed that his father had a deed to the land.

"The evidence hereinafter referred to in the statement of facts shows that Appellee, Mack Vinson, and his father have exercised such dominion and control over the land as to far exceed the ordinary possession of a cotenant, and to the extent that there remains no question of the adverseness or notoriety of their claim as against the presently claiming Appellants. The conduct of both Mack Vinson and his father while in possession of the land was wholly inconsistent with the equal right of any of their relations, no matter how numerous, to the right of use and enjoyment of the property. This inconsistency also evidences unequivocal adverseness. The occupancy of the Appellants was not in recognition of any cotenants' right, but adverse thereto.

"The three hundred and more Defendants in this case all claim to be heirs of Malachi Vinson, deceased, and take the position that the burden was upon Appellees to prove exclusive, peaceable, and adverse possession, use and enjoyment of the premises, for ten consecutive years prior to the institution of this suit, assuming their claim of cotenancy to be correct. * * *

"The record in this case shows that there was no suit interrupting the continuous possession of Appellees who held the land from 1898 until the time the suit was filed. (Note: The suit was filed May 1st, 1958—Interpolation ours.) * * *

"*Adverse Possession as Shown in the Record.*

"Appellee Mack Vinson's father and mother, Mack Vinson, Sr., and Mrs. Nina Vinson, were living on the land in 1898 when Appellee, Mack Vinson, was born, and there they remained until sometime between 1905 and 1910 when they moved to a nearby community. From the time they moved from the land in controversy, the land was either used by themselves, or by their tenants each and every year until this lawsuit was filed. All tenants paid Mack Vinson and his father rent. During all of this time and until 1955, when the Tatum Oil Field came in, Appellee Mack Vinson, who was called Mack Vinson, Jr., or Little Mack Vinson, believed that his father had a deed to the lands. During all of the years, Appellee made such improvements on the land as building a home and corn cribs, built and repaired fences, and cleared the land.

"Appellees rendered and paid taxes on the land every year from 1898 to date before they became delinquent.

"After they moved away from the place, Appellees cultivated the lands for two or three years.

"Mack Vinson was an only child and continued to live with his parents, Mack Vinson, Sr., and Mrs. Nina Vinson. Mack Vinson, Sr., died in the year of 1936.

"The crops that they grew on the land were cotton and corn, and other years they rented the land to such tenants as a Mr. Wilson who farmed it in corn and cotton for two years; Homer Free, Byron Cole, Doc Gipson; Raymond Vincent; Robert Vincent, Julian Vincent; Tom Vincent; Cecil Murray; Willie Jennings, George Jennings, were other tenants on the land.

"The land was used by these tenants for farming crops of cotton, corn, watermelons, or for grazing cattle, and Mack Vinson and his father collected all of the rents, some in the form of standing rent and some cash rent, from the tenants.

"During this long period of approximately sixty years, Mack Vinson and his father sold the timber which grew on the land to various strangers to the title, such as Ford and Allen; Watt & Benson; Tony Allen and Hershel Porter; Vernon Pepper, and received sums of money up to Seven Hundred Dollars ($700) for the respective sales, all of which they kept for their own use.

"Appellee Mack Vinson, himself, cut some of the timber, making crossties therefrom. He and his father kept all the money from the sales of ties and timber.

"Benson and Watt, holding under Appellees, ran a sawmill on the place for two or three years from 1918.

"When the land was not used for growing crops, it was used for pasture. During the time it was used for pasture, principally the last ten or twelve years, when agriculture had slowed down in the community, the fences were kept in good condition to hold cattle. This use of the land was continuous for the entire period.

"*Claim of Right as Shown in the Record*

"During all the time from 1898 until the time the suit was filed, Appellees claimed to be the owners of the land. The claims of ownership were not only testified to by Appellee Mack Vinson and the witnesses for Appellee, but also by witnesses for Appellants.

"Mrs. Ira Strong, a witness produced on behalf of the Defendants, whose maiden name was Ira Vinson, and who is actually now claiming an interest in the lands under the Malachi Vinson estate, and who lives in the same community with Appellees, and who visited with Appellees quite a bit, knew that Mack Vinson and his father had possession and use of the premises ever

since she had been born, and knew that they claimed it. When questioned on cross examination, she testified as follows:

"'Q. Now, you knew that Mack Vinson's father and Mack Vinson were using this place in this lawsuit, did you not? A. Yes, I knew that.

"'Q. You knew they used it for a number of years? A. Yes.

"'Q. Since you have been born? A. Yes, sir.

"'Q. Knew that of your own knowledge? A. Yes.

"'Q. You knew they farmed it and pastured it and claimed it? A. Yes, I did.'

"Mr. Leon Vinson, another witness produced by Appellants, and who also lives in the same community with Appellees, * * * when questioned about Mack Vinson's claim to the property, testified as follows:

"'Q. He is the only one you ever saw on the place? A. Yes, sir.

"'Q. You knew that he was claiming it, didn't you? A. Yes, I knew he was claiming it.

"'Q. And you have known that since you were born, or big enough to remember, haven't you? A. Yes.'

"Mr. Robertson Vincent, another witness produced by Appellants, and who lives right across the road from the land and has lived there eighty years, testified that he had known the land all of his life. He bought his land from Appellant Lacy. He knew about the timber sales. His own son, Julian, had rented the land from Appellee. Although Mr. Robertson Vincent claimed an interest in the land, and was a direct heir of Malachi Vinson, as are the Appellants herein, and is an uncle to Mrs. Pauline Helvenston, Lillian Vincent Boothe, Clara Mae Vincent Spencer, Doris Vincent Boyd, Melba Vincent Mullins, and a brother-in-law of Mrs. Ninnie Vincent, one of the principal witnesses for the Appellants, and one of the principal claimants for herself and her children, Mr. Robertson Vincent did not tell anybody in his family about the various tenants using the property, such as his son, Julian; Mr. Gipson, he says 'because that was none of my business', nor did he tell any of the members of his family about the timber sales. Though he always knew he had an interest in the property, he made no objection to the tenants or anyone using the property, and in connection therewith stated:

"'Q. I see, always knew it. Now did you make any objection to these people using the place? A. No, sir.

"'Q. You didn't think it was any of your business? A. I just didn't want no hard feelings.

"'Q. Oh, I see, you didn't want to start any trouble, and they were paying Mack all of the time? A. Yes.

"'Q. And when Vernon Pepper was down there, was hauling those logs down there you knew he bought those off of Mack, didn't you? A. Yes.

"'Q. You didn't make any protest about that, did you, Mr. Vincent? A. No.

"'Q. Just didn't want to have any trouble? A. No, sir.

"'Q. I see. Did you tell your sister-in-law Ninnie Vincent about it? A. No, sir.

"'Q. Did you tell your sister-in-law that Julian Vincent was paying Mack rent and she wasn't getting her share of it? A. No.

"'Q. Did you ask your father Julian to pay you any of the rent that he was giving Mack on the place? A. No.

" 'Q. Now, your brother, Tom, was renting the place too, was he not, Mr. Vincent? A. I think one year.

" 'Q. All right, more than that as a matter of fact, wasn't it about three years? A. I think he had it.

" 'Q. Well, you knew he was paying rent to Mack too, didn't you? A. Oh, yes. No, I didn't know it, but then I supposed that he was.

" 'Q. Everybody did, didn't they? A. Yes.

" 'Q. And you never asked for your part of that, did you? A. No, sir.'

"His mother was living on the adjoining farm all the time. Her name was Elizabeth Vincent, and under whom the principal Appellants claim, and who never made any claim to the property though she was living next door to it. In this connection, Mr. Robertson Vincent testified as follows:

" 'Q. And your mother was living there at the time when Tom was farming that land, wasn't she? A. I don't know whether that was before she died or after.

" 'Q. Well, of course I can't tell, the record here shows that she was still living, now she never claimed any of that rent, did she? A. I don't know. If she did I never heard of it.'

"The record shows that Mrs. Elizabeth Vincent, Mr. Robertson Vincent's mother, was living there next to the land in controversy at the time T. H. Vincent was farming the land as a tenant of Mack Vinson.

"Mr. Robertson Vincent's brother, Tom H. Vincent also rented the place and paid Appellees rent. * * *

"Thomas L. Vincent, son of T. H. Vincent, one of the Malachi Vinson heirs and a first cousin to Mrs. Pauline Helvenston, Mrs. Boothe, Mrs. Spencer, Mrs. Boyd, and Mrs. Mullins, the principal Appellants, and a nephew to Mrs. Ninnie Vincent, after identifying the land, testified that he first knew the land in 1921 when his family moved on it and stayed about three years. They rented the land from Mack Vinson, Jr. They made three crops and paid rent every one of these years. They paid the rent to Mack Vinson, Jr., except on the land they cleared, which they had the free use of by agreement with Mack Vincent as a consideration for clearing it. During all that time, Mack Vinson claimed to own the land. During the time that he lived in the neighborhood through 1927, no one else demanded any rent from them, except Mack Vinson, and no one else except Mack Vinson made a claim to ownership. At the time they were there, Mr. Robertson Vincent, Appellants' witness, was living right across the road from them, as was a cousin, Mr. Julian Vincent."

■ Appellants correctly contend that possession, payment of taxes, the sale of timber, and claim of ownership alone are not sufficient in cotenancy cases to support the acquisition of title to land by adverse possession by one cotenant against another.

■ However, for appellees to have acquired title by limitation (with other necessary factors being present) actual notice of their adverse claim against their cotenants was not required to be personally given to each of the more than 300 defendants. There was evidence of probative force in the record to support the conclusion that many of the defendants who lived near the land in question had actual notice of appellees' adverse and hostile claim to the land in question. However, many of the numerous defendants lived far away from the land in other parts of Texas and out of Texas, and many of them apparently had not heard of the land until after the oil excitement shortly prior to the suit or until after the suit was brought in 1958.

It is not necessary that actual notice of an adverse holding and disseizin be brought home to a cotenant when the adverse occupancy and claim of title is so long-continued, open, notorious, exclusive, and inconsistent with the existence of title in others, except the occupant, that the law will raise the inference of notice to the cotenant out of possession; or the jury may rightfully presume such notice. Moore v. Knight, 127 Tex. 610, 94 S.W.2d 1137; Rae v. Baker, Tex.Civ.App., 38 S.W.2d 366, wr. ref.

In Rae v. Baker, supra, 38 S.W.2d 366, 369, error refused, it was stated:

"* * * But where the party in possession, as in this case, has been in open, notorious, adverse, and peaceable possession of said lands, making improvements thereon, paying taxes thereon, using and cultivating same, and openly claiming exclusive ownership thereof against the world for a period of twenty years, and for a period of seventeen years after the right of appellees to their possession accrued, and without knowledge or recognition of their outstanding claim, which was not asserted by them until 1929, we think his adverse possession and claim was of such 'unequivocal notoriety' as to conclusively constitute presumptive notice to appellees of its hostile character.".

Appellants among other things in connection with their "no evidence" points, contend to the effect that appellees' evidence constitutes no more than a mere scintilla of evidence and is too weak to constitute evidence of probative force to support the verdict and answers of the jury to special issues 1 and 2. With this contention we respectfully disagree. It is our view that the testimony of appellee Mack Vinson, Jr., constituted more than a scintilla of evidence and was evidence of probative force —furthermore, his evidence was corroborated in various phases by numerous witnesses placed on the stand by appellees, and was in some phases corroborated to some extent by some of appellants' witnesses.

After carefully considering appellants' "no evidence" points under the rules enunciated by decisions of the Supreme Court of Texas, as discussed by Justice Calvert in the Texas Law Review Article of April, 1960, above referred to, and after carefully examining the record, we hold that there was evidence of probative force in the record to support the jury's verdict and its answers to Special Issues Nos. 1 and 2.

After carefully reviewing all the evidence adduced in the case we further hold that the evidence was sufficient to support the jury's verdict and its answers to Special Issues Nos. 1 and 2.

With respect to appellants' points that the verdict of the jury and the answers of the jury to Special Issues Nos. 1 and 2 were against the great weight and preponderance of the evidence we make the following statement and holding: The statement of facts in this case consists of five volumes, and contains the testimony of numerous witnesses and numerous exhibits. Appellee Mack Vinson, Jr., testified at great length— appellants point out what they contend are inconsistencies and alleged admissions against interest in his testimony; appellees counter by quoting further testimony of appellee Mack Vinson, Jr., which they contend clears up any and all apparent inconsistencies in his testimony. Numerous witnesses testified for both parties, and there were diverse conflicts and inconsistencies in the testimony of defendants' and plaintiffs' witnesses. The jury in the case apparently reconciled any and all inconsistencies, and apparent inconsistencies in the testimony adduced, in favor of appellees. We have carefully reviewed all the evidence adduced in the case in the light of the rules announced by the Supreme Court of Texas in the case of In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and hold that the verdict of the jury and its findings in response to Special Issues Nos. 1 and 2 are not so contrary to the great weight and preponder-

ance of the evidence as to be clearly wrong and manifestly unjust.

Appellants' points 1 through 11, inclusive, are respectfully overruled.

Appellants by their points 12 to 32 inclusive make various attacks upon the court's charge, explanatory instructions, issues submitted, and the failure of the trial court to give various special issues and explanatory instructions requested by appellants, and also raise other matters.

We think the trial court's charge was essentially and substantially correct. Viduarri v. Bruni, Tex.Civ.App., 179 S.W. 2d 818, wr. ref. We think the trial court properly submitted the ultimate issues of fact, and in submitting the issues on the 10 year statute of limitations it was permissible for the court to give explanatory instructions rather than submitting numerous additional special issues. Rule 277, Texas Rules of Civil Procedure; Viduarri v. Bruni, supra; Beauchamp v. Beauchamp, Tex. Civ.App., 239 S.W.2d 191, wr. ref., n. r. e. The trial court properly submitted the controlling issues raised by the pleadings and the evidence, and did not err in refusing the special requested issues and explanatory instructions sought by appellants. Rule 279, T.R.C.P. Furthermore, appellants' points 12 to 32 inclusive are deemed as not presenting reversible error under the record in this cause under Rule 434, T.R.C.P., and are respectfully overruled.

Appellants' points 33 and 34 complain of the admissions of certain exhibits and certain testimony of a witness in evidence. It is thought that such exhibits and evidence were admissible for whatever probative force they may have had. However, at any rate such points are deemed as not presenting reversible error under the record in this case and are respectfully overruled. Rule 434, T.R.C.P.

The judgment of the trial court is affirmed.