Bea THEDFORD, et al., Appellants,

v.

UNION OIL COMPANY OF CALIFORNIA, et al., Appellees.

No. 05–96–0865–CV.

Court of Appeals of Texas, Dallas.

Aug. 9, 1999.

Publication Ordered Aug. 31, 1999.

Thomas G. Nash, Jr., Dallas, for Appellants.

Cynthia Keely Timms, Locke Purnell Rain Harrell, Dallas, Maryanna Robinson, Peggy O. Donley, Exxon Corporation, Jeanne Janelle Jacoby, Houston, Keith R. Verges, Mark T. Davenport, Figari & Davenport, LLP, Dallas, Harold F. Curtis, Jr., Curtis, Alexander, McCampbell & Morris, Greenville, for Appellees.

Before Justices OVARD, MALONEY, and JAMES.

## OPINION

Opinion By Justice OVARD.

In this trespass to try title suit, appellants,[1] the Walling Heirs, filed suit against various individuals and oil companies [2] who

---

1. Imogene Aho, Mary L. Andrews, Dorothy R. Arth, Loretta K. Bascom, Bonna L. Bearden, Mary R. Black, Daymon L. Boyce, Jack Boyce, Lillian C. Boyston, Freda M. Brown, Lois R. Buckner, Freda F. Burke, Ray A. Bustin, Loren D. Bustin, Bill D. Chilton, Norma L. Choate, Abby L. Crager, Sammye L. Delarosa, Geraldine Denson, Eunice I. Dodd, John C. Edwards, Janie F. Etherege, Elinor F. Evans, Clara V. Evans, Barbara K. Ferree, Burgess P. Franklin, Thelbert C. Fuller, Willie W. Gee, Melba E. Hackfeld, Howard D. Hagood, Thurman W. Hagood, David K. Hagood, Minnie B. Hamilton, Josephine J. Hance, Tama J. Hanley, George Hendrix, Sr., Claude A. Hildebrand, Loyd HC Hildebrand, Carl F. Hildebrand, Oneta M. Horn, William C. Hume, Muriel B. Ince, Francis L. Jordan, Dianne O. Keen, Woodrow W. Kidd, Stelvin Kidd, Elbert L. Kidd, Mattie M.R. Light, Janis G. Lukens, Calvin G. Manning, Jr., Thomas H. Moloney, Charles E. Moody, Eldred D. Moody, Darlena M. Moon, Archie G. Morrison, Juanita B. Nelson, Beatrice Pagel, Ruby Parker, Willie B. Perkins, Mary E. Petillo, Elizabeth A. Quast, Gertrude E. Redinger, Erma M. Richardson, Clay V. Riley, Jr., John C. Robertson, Eva P. Rogers, Leo E. Root, Patsy M. Russell, Romell M. Saunders, Sherri L. Schiele, Martha C. Selch, Billy G. Simpson, John H. Simpson, Steven Simpson, Oweeda Smith, Pam Smith, Reba D. Snead, Mary J. Sovelenko, Juanita V. Stahlheber, Norman C. Storm, E. Lorraine Swart, Nathan L. Swindle, Nancy L. Tallman, Florene J. Taylor, Anthony J. Thompson, Julie A. Thompson, Clarence D. Thompson, James H. Thompson, Joyce M. Veenstra, Muriel J. Vincent, Debbie L. Wagner, Dessa Mae Walling, Ralph E. Walling, George W. Walling, Johnny B. Walling, Dorothy E. Watson, Jr., Charles W. Williams, Eugene R. Williams, Emma J. Wilson, Barbara S. Wise, and Dorothy Wood (collectively referred to as "the Walling Heirs").

2. Union Oil Company of California, Van Salt Water Disposal Company, Exxon Corporation, (the "oil companies"), Teresa Barton,

owned portions of land referred to as the Walling Survey. The Walling Heirs claim they inherited an interest in the Walling Survey that was purportedly conveyed to a third party in 1857. They claim that, after more than 100 years of possession and mineral production by third parties, they still own an interest in the Walling Survey and should be paid a percentage of the royalties that have been distributed from the property.[3] The trial court granted summary judgment in favor of the appellees on their affirmative defenses of statute of limitations, adverse possession, and presumed lost deed. In four points of error, the Walling Heirs contend the trial court erred in granting summary judgment and in sustaining objections to the Walling Heirs summary judgment proof. For the following reasons, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

In 1838, John Walling, Sr. received one league and one labor of land in Nacagdoches County, Texas. Walling, Sr. had eleven children, nine from his first marriage and two from his second. When Walling, Sr. died in 1841, he left 320 acres to each of the nine children from his first marriage, and the remaining 2,862 acres (the Walling Survey) to his second wife, Judy, and their two children, Richard and William. When Judy died in 1842, the entire 2,862 acres went to Richard and William. William died a minor in 1854. There is no record of William having a will or otherwise conveying his interest in the property before his death. In 1857, Richard conveyed the 2,862 acres to R.W. Berry. Since that time, the land has been sold and/or leased

in portions to individuals and oil companies. In 1927, portions of the land were leased for oil and gas development. Oil was discovered on a portion of the Walling Survey known as the Van Oil Field, and, since that time, the Van Oil Field has produced hundreds of millions of barrels of oil.

In 1941, a group of people claiming to be the heirs of William's half-siblings filed a trespass to try title action against the oil companies holding leases on the Van Oil Field, claiming that Richard could not and did not convey William's interest in the property to Berry in 1857.[4] They asserted that they, as the heirs to William's half-siblings, inherited William's interest. Additional Walling heirs intervened in the suit, also claiming interests in the property. In May of 1944, the suit was dismissed.

In the 1970s and 1980s, various individuals claiming to be heirs of William Walling wrote to Unocal, the operator of the mineral production on the Walling Survey. The heirs asserted an interest in the property and claimed that royalties from the mineral production should be paid to them. Unocal informed the heirs that it had searched the title records to the land and it believed royalties were being paid to the persons entitled to them.

In the late 1980s, Bea Thedford, one of William's heirs, organized the "Walling Heirs Association," whose stated purposes included establishing any lawful claims to the assets of the Walling heirs. The organization raised money from its members, persons claiming to be William's heirs, to hire an attorney and file a lawsuit to deter-

Craig Lenwood Barton, Jerry Cooke, Dorothy M. Gardner, W.J. Garrett, M. D., John A. Howell, Obie Nations, George W. Shirley, Morris E. Smart, Cynthia K. Smart, Henry O. Wright, Sr., Henry O. Wright, Jr., Jimmy D. Rice, Cynthia Rice, Vince R. Hosea, Brett A. Carr, Kristi Carr, Robert Wheeler, Cathy Wheeler, David A. Ribble, Jr., Malvin Fowler, Emma Fowler, Richard Williamson, Ann Francis Haley (the "homeowners"). Except where it is necessary to distinguish them, the appellees will be collectively referred to as "appellees."

3. The Van Oil Field, a portion of the Walling Survey, has produced hundreds of millions of barrels of oil since it was discovered in the 1920s.

4. One of the plaintiffs in the 1941 lawsuit was H.C. Thompson, the grandfather of Bea Thedford, the lead plaintiff in this action.

mine what rights, if any, they had in the Walling Survey. The Oklahoma Department of Securities investigated the Association and determined that Thedford had violated Oklahoma securities laws by selling memberships to the Walling Heirs Association.

Several years later, Thedford and other members of the Walling Heirs Association filed suit against the companies holding oil and gas leases on the Walling Survey and against individual homeowners living on the property. The Walling Heirs claimed that they owned an interest in the Walling Survey as heirs of William because the Berry deed did not transfer William's interest. The appellees moved for summary judgment, based on affirmative defenses of statute of limitations, adverse possession, and presumed lost deed. After a hearing, the trial court granted all of the appellees' motions for summary judgment. The Walling Heirs appealed the trial court's summary judgments.

## STANDARD OF REVIEW

The standards for reviewing a summary judgment are well established: (1) the movant for summary judgment has the burden of showing there is no genuine issue of material fact and it is entitled to summary judgment as a matter of law; (2) in deciding whether there is a disputed fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). A defendant who moves for summary judgment must show that the plaintiff has no cause of action. A defendant may meet this burden by either (1) disproving at least one essential element of each theory of recovery, or (2) conclusively proving all elements of an affirmative defense. *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex.1993); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 27 (Tex.1990).

When a summary judgment order does not specify the grounds upon which the motion was granted, the reviewing court will affirm the judgment if any theory advanced in the motion is meritorious. *State Farm Fire & Cas. Co., v. S. S.*, 858 S.W.2d 374, 380 (Tex.1993). Because the summary judgment here does not state the grounds relied upon in the judgment, we affirm the judgment if any theory advanced by appellees in their motions is meritorious.

## ADVERSE POSSESSION

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV.PRAC. & REM.CODE ANN. § 16.021 (Vernon 1986). A cotenant may not adversely possess against another cotenant unless it clearly appears he has repudiated the title of his cotenant and is holding adversely to it. *York v. Flowers*, 872 S.W.2d 13, 15 (Tex.App.-San Antonio 1994, writ denied) (citing *Todd v. Bruner*, 365 S.W.2d 155, 156 (Tex.1963)). Notice of repudiation must be clear, unequivocal, and unmistakable. *Sebesta v. Daniels*, 812 S.W.2d 641, 645 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (citing *Todd*, 365 S.W.2d at 160). However, when the adverse occupancy and claim of title "is so long-continued, open, notorious, exclusive, and inconsistent with the existence of title in others, except the occupant, the law will raise the inference of notice to the cotenant out of possession." *Amador v. Berrospe*, 961 S.W.2d 205, 208 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *Mills v. Vinson*, 342 S.W.2d 33, 40 (Tex.Civ.App.-Texarkana 1960, writ ref'd n.r.e.).

In their first three points of error, the Walling Heirs contend the trial court erred in granting summary judgment because genuine issues of material fact exist that preclude summary judgment and because the grounds asserted by defendants are not viable as a matter of law. They argue

these points together; therefore, we address these points together.

Specifically, the Walling Heirs argue that fact issues exist as to whether a cotenancy existed between the Walling Heirs and Berry and his successors-in-interest, and as to whether the cotenancy was repudiated. Further, they argue that fact issues exist as to whether appellees conclusively established that they adversely possessed the property. Although plaintiffs discuss community property laws and the laws of distribution and descent to show that William owned an interest in the Walling Survey, no one disputes that, at the time Judy Cahill Walling died, William inherited one-half of the estate Walling, Sr. had left to her, which included the Walling Survey. Further, no one disputes that, in the absence of the presumed lost deed doctrine, we can assume that at the time William died, part of his interest went to his full brother, Richard, and a fraction went to his half-siblings. However, because we are reviewing whether the trial court erred in granting summary judgment on the affirmative defenses asserted in the motions for summary judgment, we need not determine whether or how much of an interest passed to William's half-siblings; rather, we may assume without deciding that some of William's interest passed to his half-siblings on his death.

### Cotenancy

■ The Walling Heirs first contend that they are cotenants with appellees as to the Walling Survey, and that such cotenancy relationship has existed from the time of William's death. They argue that fact issues exist as to whether the cotenancy has ever been repudiated and thus, there is a fact issue as to whether the time period for adverse possession ever began running.

Appellees first respond that no cotenancy relationship existed after Richard conveyed the property to Berry. Alternatively, they argue that even if such a relationship existed, appellees repudiated the relationship and then adversely possessed the property long enough to satisfy any of the applicable statute of limitations. We agree that, assuming a cotenancy existed between Richard and William's half-siblings, the summary judgment record conclusively establishes that any cotenancy relationship was repudiated, and that appellees and their predecessors have adversely possessed the property.

### Repudiation of Cotenancy

The Walling Heirs argue that the summary judgment evidence raises a fact issue as to whether the cotenancy was repudiated because (1) the oil company leases contained proportionate reduction clauses that specifically recognized a cotenant or other outstanding interest; (2) in response to the Walling Heirs' written inquiries, Union invited satisfactory evidence of an ownership claim; (3) a cotenant may lease the entire property without the consent of his cotenants; (4) appellees did not have knowledge of the Walling Heirs's claims; and (5) the Berry deed did not give notice of repudiation to the cotenants.

We conclude, however, that none of these factors, alone or together, raises a fact issue on this record as to repudiation of cotenancy. Although the oil company leases did contain proportionate reduction clauses, there is no evidence in this record that any other party, including the Walling Heirs, proved that they owned any interest in any of the property covered by the leases. Upon the Walling Heirs's written inquiries in the late 1970s, Union responded in July of 1978 that it had searched the title to the property and concluded that the Union leases were obtained from people having good title. Union also informed the Walling Heirs that, should they desire to pursue their claims, they would have to present satisfactory evidence of ownership, but that, as far as Union was concerned, the royalties were going to the proper parties. We do not interpret this letter as

a recognition of competing ownership claims; rather, the record shows that Union was firmly stating its position of ownership and asserting that it would respond only to evidence of ownership and not to mere claims that it believed, based on its review of title, to be mistaken.

■ Further, under these facts, the evidence conclusively shows that any cotenancy was repudiated, if not by the original conveyance to Berry, then by the following conveyances to individuals and oil companies who continuously possessed and developed the Walling Survey. When a party obtains title to property from one cotenant through an instrument purporting to convey the entire title to the land, such a conveyance constitutes ouster and amounts to disseizin of the nonparticipating cotenant, especially when the grantee is a stranger to the cotenants. *Sadler v. Duvall,* 815 S.W.2d 285, 289 (Tex.App.-Texarkana 1991, writ denied). *Cf. Todd v. Bruner,* 365 S.W.2d 155, 159 (Tex.1963) ("[i]nsofar as the true owner of property is concerned, there is a vast difference between the notice of adverse claim conveyed by the presence of a stranger in possession and that of a cotenant in possession").

The evidence in this case shows that Richard purported to convey the entire property to Berry by a deed that was duly recorded. The property was then occupied by strangers to the Walling family. Through a series of conveyances, portions of the property were sold to individuals who built houses, businesses with security fences, roads, septic systems, fences, and other visible and obvious improvements. The evidence also shows some of the owners posted "no trespassing" signs, farmed, and grazed cattle and rabbits. Other portions of the property were leased to oil companies who began drilling in the 1920s and have since built up extensive drilling operations that have produced significant amounts of oil. In the early 1940s, some of the Walling Heirs, led by Bea Thedford's grandfather, filed suit against the oil companies, claiming an interest in the property. After that suit was dismissed, some of the Walling Heirs sent letters to the oil companies in the late 1970s and early 1980s claiming a right to royalties that were not and have not been paid to them. The oil companies responded in writing by stating that they had searched the title records and concluded that they were paying royalties to the parties who were entitled to them. This evidence shows that the Walling Heirs knew they were not peacefully coexisting with possessory cotenants. From the 1940s lawsuit on, the Walling Heirs have affirmatively shown that any interest they might have in the property would only be recognized through litigation.

■ Finally, although the Walling Heirs claim that they did not individually have actual notice of any repudiation or of the Berry deed, we conclude that under these facts proof of actual notice is not necessary. "It is not necessary that actual notice of an adverse holding and disseizin be brought home to a cotenant when the adverse occupancy and claim of title is so long-continued, open, notorious, exclusive, and inconsistent with the existence of title in others, except the occupant." *Spiller v. Woodard,* 809 S.W.2d 624, 628 (Tex.App.-Houston [1st Dist.] 1991, no writ) (quoting *Mills,* 342 S.W.2d at 40). In such a case, the law will raise the inference of notice to the cotenant out of possession. *Id.*

We conclude that the adverse occupancy that lasted for at least seventy years has been so long-continued, open, notorious, exclusive, and inconsistent with the existence of title of anyone other than the occupants that we may conclusively presume the Walling Heirs had notice of repudiation. *See Mills,* 342 S.W.2d at 41. Further, evidence of the Berry lease, the lawsuit, and the oil companies' responses to the Walling Heir's inquiries conclusively establishes that any cotenancy that may have existed was repudiated as a matter of law.

## Evidence of Adverse Possession

█ Finally, the record conclusively establishes that the possession of the property by the homeowners and the oil companies has been continuous, inconsistent with and hostile to the claim of the Walling Heirs for a period of time long enough to satisfy the applicable statutes of limitations. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 16.025 (five-year statute), § 16.026 (ten-year statute), § 16.027 (twenty-five year statute) (Vernon 1986); *see also Peregoy v. Amoco Prod. Co.,* 929 F.2d 196, 196 (5th Cir.1991) (the nonuse and nonclaim to the land by heirs for more than 125 years, when measured against possessors' active use and claim, justifies the imposition of a conclusive presumption that the heirs lost their title) (citing *Humphries v. Texas Gulf Sulphur Co.,* 393 F.2d 69, 72 (5th Cir.1968), *cert. denied,* 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991)). The homeowners, who are the surface owners of the property, presented evidence of record title to their portions of the property going back at least five years, and some more than twenty-five years. They presented evidence that they have paid taxes on the property and have openly and notoriously possessed the property to the exclusion of others. The record shows that the homeowners and their predecessors in interest have lived on and developed the property for at least twenty-five years.

█ The mineral owners also presented evidence to conclusively establish they have adversely possessed the property. When the surface is separated from the minerals, mineral rights are adversely possessed by drilling and producing the minerals for the statutory period of time. *Sun Operating Ltd. Partnership v. Oatman,* 911 S.W.2d 749, 757 (Tex.App–San Antonio 1995, writ denied). The record shows that, since 1927, continuous drilling operations have resulted in significant oil and gas production on the Walling Survey. Exxon, Unocal, and Van Salt Water have exercised dominion over the property since the 1920s and 1930s and have paid royalties to the record owners and have never paid any royalties to persons claiming to be William's heirs. They presented evidence that they have paid taxes on the property since at least 1969.

Finally, the evidence shows that appellees have been in peaceable possession of the property since the dismissal of the 1941 lawsuit. *See* TEX.CIV.PRAC. & REM. CODE ANN. §§ 16.025(a), 16.026(c), 16.027 (Vernon 1986); *see also* TEX.CIV.PRAC. & REM.CODE ANN. § 16.021(3) (Vernon 1986) ("peaceable possession" means possession of real property that is continuous and not interrupted by an adverse suit to recover the property). We conclude the summary judgment evidence conclusively establishes that both the surface and the minerals have been adversely possessed long enough to satisfy any of the applicable adverse possession statutes, including the twenty-five year statute. *See* TEX.CIV. PRAC. & REM.CODE ANN. §§ 16.025, 16.026, 16.027 (Vernon 1986). Because the trial court properly granted summary judgment on the affirmative defense of adverse possession, we overrule the Walling Heirs first three points of error.

## Objections to Summary Judgment Evidence

█ In their fourth point of error, the Walling Heirs contend the trial court erred in sustaining objections to their summary judgment proof. However, in their brief, the Walling Heirs do not direct this Court to the specific ruling in the record nor do they identify which affidavits were excluded. Further, they cite no authority for their argument. Bare assertions of error, without citations to the record or to authority, waive error. *Sullivan v. Bickel & Brewer,* 943 S.W.2d 477, 486 (Tex.App.-Dallas 1995, writ denied); *see also Fredonia State Bank v. General Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994) (appellate court has discretion to waive points of error due to inadequate briefing). We

conclude the Walling Heirs have waived their fourth point of error.

We affirm the trial court's judgment